454

**In re D.T.**

*John Lyons,* for minor.
*George F. Shultz,* for the Millers.
*Robert B. Lieberman,* for Children and Youth Agency.

TURGEON, *J.,* November 4, 1996—This matter concerns a request by D.T., a minor, and his former foster parents, Patricia and Ronald Miller, for court approval to allow him to visit the Millers on weekend passes from his current placement with Kids Peace, a state-licensed institutional residential facility. A hearing was held October 18, 1996 following which their request was granted. This opinion is written in support of that decision.

## BACKGROUND

D.T. is 13 years old. In 1983, D.T., less than one year old, was adjudicated dependent and placed in foster care.[1] In January of 1992, following numerous placements, he was placed in the foster care of the Millers. D.T. was a challenging child due to his many problems, not the least of which surely was a most difficult childhood. Diagnosed with attention deficit and hyperactivity disorders, he was prescribed Ritalin. When he was 12, D.T. took an overdose of Ritalin and was hospitalized. Thereafter, he was placed at Kids Peace. A child be-

---

1. D.T.'s mother has had very little contact with him since he was placed in foster care, and his biological father has been incarcerated for most of D.T.'s life.

having well at Kids Peace moves up certain "levels." D.T., performing very well, achieved the level permitting him weekend home visits.

Because he considers the Millers to be his family, he desires to visit them for his well-deserved occasional weekends, and they seek approval as well for this arrangement.[2] The problem, however, is that D.T. has not been permitted to visit them by his legal custodian, Dauphin County's Children and Youth Agency, because during the four and one-half years he lived with them, he was spanked several times. Department of Public Welfare regulations prohibit foster parents from using any type of corporal punishment, no matter how slight. Accordingly, the Children and Youth Agency, bound by DPW regulations, is unable to approve the Millers' home for D.T's weekend visits.

D.T. testified in-chambers.[3] He was polite, sincere, well-dressed and fairly articulate. He testified that he was spanked while wearing jeans by Mr. Miller a few times with a paddle because he had hit people in school. (N.T. 6.) He said the spankings calmed him down. (N.T. 6.) He stated Mr. Miller did not hit him hard: "It was almost like a tap and then he would tell me how much he cared for me plus it was not like often." (N.T. 5-6.) He spoke most fondly of the Millers, saying that "[t]hey

2. The Millers do not seek to be a permanent placement at this point but only to act as a visiting resource for D.T. They would, however, consider again acting as D.T.'s foster parents upon his discharge from Kids Peace if D.T.'s behavior continues to improve and the visits go well. (N.T. 15-16.)

3. Present in the court's chambers, in addition to the judge and the court reporter, were legal counsel for the Millers, D.T. and the Dauphin County Children and Youth Agency.

always sat down and talked to me and they also, I didn't even know how to read when I first came with them. They taught me almost everything I know how to do, like read, write." (N.T. 9.) In addition, D.T. stated he feels very safe with the Millers and cares about them very much. (N.T. 11.)

The Millers have lived in their upper Dauphin County home for 29 years. (N.T. 14.) They have three grown children and five grandchildren. Mrs. Miller ran a state-approved day care in her home for 17 years. (N.T. 22.) Mr. Miller works for Bethlehem Steel. D.T.'s four and one-half year stay with them was his longest placement. (N.T. 14.) Mrs. Miller described her relationship with D.T. as "mother-son." (N.T. 15.)

D.T. was a very challenging child, according to Mrs. Miller. She explained they used every method of discipline "in the book," including "1, 2, 3, magic, sitting on the steps, making him write, going over the situation that he did, helping him realize what a new way of handling [the problem] would be. I mean, I read and read and tried everything that I could think of." (N.T. 17.) Mrs. Miller recalled that she and her husband resorted to spanking D.T. on three isolated occasions. (N.T. 19.) On those occasions, they gave D.T. three or four swats with a small rubber paddle (less than one foot long) while D.T. was fully clothed. (N.T. 19-20.) On one occasion, D.T. was rude and disrespectful at a family reunion. After the family returned home, the Millers discussed his behavior with him. He responded that he would do what he did again, at which point he was spanked. (N.T. 16-17.) While the Millers could not recall the exact circumstances predicating the other spankings, they recalled they were given for behavior such as D.T. physically acting out, including hitting, spitting at and pulling Mrs. Miller's hair. (N.T. 26.)

In addition, Mr. Miller recalled once swatting D.T. on his buttocks with a fly swatter while D.T. had jeans on. (N.T. 27.)

Mrs. Miller further testified that when she first applied to be a foster parent with Pennsylvania Mentor (the foster care provider for Dauphin County Children and Youth at the time the Millers applied), she specifically wrote on the application that she did not consider spanking to be corporal punishment.[4] (N.T. 21.) She was never questioned about this comment. (N.T. 21.) While the Millers both testified that they still believed spankings are appropriate discipline as a last resort, they agreed that D.T. is now too old for such punishment and that if a severe problem arises, they would seek Children and Youth's intervention. (N.T. 22-23, 25.)

D.T. requests he be permitted to use his earned home passes to visit with the Millers for the designated weekends. Kids Peace does not have an objection to D.T. going to the Millers for his approved home visits. The Children and Youth Agency, but for the spankings that violate DPW policy, would have no objection to D.T. visiting the Millers. (N.T. 38.)

## LEGAL ISSUES

The legal issues presented are (1) whether the Millers, D.T.'s formerly approved foster parents, who mildly spanked him on several isolated occasions over a four and one-half year period, are qualified to care for D.T. on his weekend home passes from Kids Peace and (2) whether this disposition is best suited to the physical, mental and moral welfare of D.T.

---

4. She stated that she considers corporal punishment to constitute beatings done in anger which leave a child with physical injuries. (N.T. 19.)

## DISCUSSION

Corporal punishment was once considered a requisite of effective parenting. The old rule of parenting was "spare the rod, spoil the child."[5] In the last two decades, however, the vast majority of parenting professionals do not condone spanking.[6] The truth probably lies somewhere in between for most parents.[7]

---

5. Proverbs 13:24 (King James) states: "He that spareth his rod hateth his son: but he that loveth him chasteneth him betimes."

6. Dr. Benjamin Spock in his book *Dr. Spock on Parenting,* 26, 150-52 (1988), argues against the use of physical punishment in disciplining children:

"I hope American parents can outgrow the conviction, which a majority have, that physical punishment is necessary to bring up well-behaved children. . . .

"In earlier decades . . . I avoided a flat statement of disapproval of physical punishment. I contented myself with the statement that I didn't think it was necessary. This was because of my belief that it's disturbing to parents when a professional person appears to imply that he knows better than they. What made me go against my own rule was my growing concern over the sky-high and ever-rising figures for murders within the family, wife abuse, and child abuse in America . . . . It's not that physical punishment creates these alarming conditions by itself, but it certainly plays a role in our acceptance of violence. If we are ever to turn toward a kindlier society and a safer world, a revulsion against the physical punishment of children would be a good place to start. My other reasons for advising against physical punishment are, in brief, that it teaches that might makes right, that it encourages some children to be bullies, and most fundamentally, that to the degree that it results in good behavior it's because of the fear of pain. I have a strong belief that the best reason for behaving well is that you like people, want to get along with them, want them to like you."

In addition, in Adele Faber and Elaine Mazlish's book *How To Talk So Kids Will Listen & Listen So Kids Will Talk,* 116-17 (1982), the authors quote a variety of professionals who do not condone physical punishment:

Certainly, a severe spanking may not only be child abuse under the law but may also be a crime.[8] However, the Millers' spankings of D.T. were neither criminal acts nor child abuse under the law. The law is clear

---

"Punishment is a very ineffective method of discipline . . . for punishment, strangely enough, often has the effect of teaching the child to behave in exactly the opposite way from the way we want him to behave!" Dr. Fitzhugh Dodson, *How to Father* (1974).

"The act of disciplining a child can be a frustrating one. However, at the outset it needs to be stressed that discipline means *education* . . . . If it is to work, discipline requires mutual respect and trust. On the other hand, punishment requires external control over a person by force and coercion. Punishing agents seldom respect or trust the one punished." Brian G. Gilmartin Ph.D., *The Case Against Spanking*, Human Behavior (Feb. 1979).

"From a review of the literature it is concluded that physical punishment by parents does not inhibit violence and most likely encourages it. Punishment both frustrates the child and gives him a model to imitate and learn from." Committee on Violence of the Department of Psychiatry, Stanford University School of Medicine, *Violence and the Struggle for Existence,* (David N. Daniels M.D., Marshall F. Gilula M.D., and Frank M. Ochberg M.D., eds., Little Brown & Company, 1970).

"There are a number of other possibilities in learning which spanking provides, none of which are intended by parents. The child may learn how to avoid successfully any guilt feelings for bad behavior by setting up a cycle in which the punishment conceals the 'crime' and the child, having paid for his mischief, is free to repeat the act another time without attendant guilt feelings. The child who does everything possible to provoke a spanking is a child who is carrying a secret debt on the 'sin' side of the ledger which the parent is invited to wipe out by means of spanking. Spanking is just what the child does *not* need!" Selma H. Frailberg, *The Magic Years* (1959).

7. Dr. Thomas Gordon, *P.E.T. Parent Effectiveness Training,* 3 (1975).

8. See *e.g., Commonwealth v. Dutton,* no. 2592-95 slip op. (Chester C.P. Oct. 18, 1996) (father's beating of 6-year-old son on buttocks with 17-inch-long, one-inch wide hardwood paddle and a thick belt,

that biological parents and guardians may mildly spank their children.

Mildly spanking one's child is not a crime. Judge Phyllis Beck, speaking for the Superior Court, wrote as follows:

"It is well-established that parents have a privilege to subject their children to corporal punishment when the children misbehave. (citations omitted) This is so because our society recognizes the primary role of parents in preparing children to assume the obligations and responsibilities of adults, and because there is a need to ensure that the state through its criminal justice system does not unduly interfere with the private realm of family life. Nevertheless, there are limits regarding the type and severity of the corporal punishment which a parent may impose. The law long ago abandoned the view that children are essentially chattels of their parents without independent legal rights. (citation omitted) Moreover, it is now clear that child abuse is a serious and widespread problem (citation omitted); the state has a powerful interest in preventing and deterring the battering of children.

"In 1972, the legislature balanced these competing interests by adopting section 509 of the Crimes Code. This section provides in relevant part:

*"The use of force* upon or toward the person of another *is justifiable if:*

---

in addition to striking him in the head and stomach, constituted aggravated assault); *Commonwealth v. Smith,* nos. 2528, 3022 C.D. 1991 slip op. (Dauph. C.P. July 27, 1993) (defendant pled guilty to endangering the welfare of children and simple assault where, after a neighbor had broken his 1-year-old son's leg, he forced the child to walk, dragged him by the hair and hit him in the face).

*"(1) The actor is the parent* or guardian *or other person similarly responsible* for the general care and supervision of a minor or a person acting at the request of such parent, guardian or other responsible person and:

*"(i) the force is used for the purpose* of safeguarding or promoting the welfare of the minor, *including the preventing or punishment of his misconduct;* and

"(ii) the force used is not designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation. 18 Pa.C.S. §509." (emphasis added) *Commonwealth v. Ogin,* 373 Pa. Super. 116, 124-25, 540 A.2d 549, 554 (1988) (en banc), *alloc. denied,* 521 Pa. 611, 557 A.2d 343 (1989).

Nor does mild spanking equate with child abuse under the law. The Child Protective Services Law defines "child abuse," insofar as it causes physical injury, as "[a]ny recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age." 23 Pa.C.S. §6303(b)(i). "Serious physical injury" is defined as an injury that "causes a child severe pain; or . . . significantly impairs a child's physical functioning, either temporarily or permanently." 23 Pa.C.S. §6303(a)(1) and (2). Even under the broader definition given child abuse pursuant to the Protection from Abuse Act, spanking will not normally constitute a violation of the Act. The Act defines "child abuse" to include the infliction of "serious bodily injury" and "bodily injury," caused "intentionally, knowingly, or recklessly." See *Miller on Behalf of Walker v. Walker,* 445 Pa. Super. 537, 549, 665 A.2d 1252, 1258 (1995) (citing 23 Pa.C.S. §6102(a)).

DPW regulations, however, establish a different standard for foster parents. The DPW regulations pro-

hibit foster parents from using any "physical punishment inflicted upon the body" as a form of punishment. Under the regulations, "passive physical restraint is the only allowable method of restraining a child." 55 Pa. Code §3700.63(b) and (c). While these regulations bind all county children and youth agencies, courts are not so bound. *In re Tameka M.,* 525 Pa. 348, 580 A.2d 750 (1990); *In re Lowry,* 506 Pa. 121, 484 A.2d 383 (1984). "The Juvenile Court maintains a continuing plenary jurisdiction in dependency cases under 42 Pa.C.S. §6351 . . . and has the power to review the circumstances of dependent juveniles and to question both the legal custodian, CYS, and the foster parents concerning the condition and the needs of the dependent child." *In re Tameka M., supra* at 352, 580 A.2d at 752. Section 6351 of the Juvenile Act sets forth the following statutory considerations:

"(a) General rule.—If the child is found to be a dependent child the court may make any of the following orders of disposition *best suited to the protection and physical, mental, and moral welfare of the child:*

"(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

"(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

"(i) *Any individual resident* within or without the Commonwealth who, after study by the probation officer or other person or agency designated by the court *is found by the court to be qualified to receive and care for the child. . . ."* 42 Pa.C.S. §6351. (emphasis added)

In ordering a disposition under section 6351, "the court acts pursuant to a separate discretionary role with

the purpose of meeting the child's best interests." *In re Lowry, supra* at 127, 484 A.2d at 386. Furthermore, it must be kept in mind that "[t]he Juvenile Act, as reinforced by our case law, was passed for the *benefit* of dependent children and is based on humanitarian ideals." *In re Tameka M., supra* at 358, 580 A.2d at 755. (emphasis in original)

The testimony is clear that, but for the spankings, the Millers have been good foster parents. Although few experts condone physical punishment of children by any means, it is this court's conclusion that despite these past minor spanking incidents, the Millers are more than "qualified to receive and care for [D.T.]" and are "best suited to [his] physical, mental and moral welfare" under section 6351. The Millers were, therefore, approved as a resource for D.T.'s weekend visits.

## CONCLUSION

The court therefore concluded despite these four isolated mild spanking incidents over a four and one-half year period, D.T. was permitted to visit with the Millers during his weekend passes.